HAROLD HART, APPELLANT, V. AMERICAN COMMUNITY STORES
CORPORATION, HINKY DINKY, APPELLEE.

292 N. W. 387

FILED MAY 24, 1940. No. 30879.

D. O. Dwyer and W. L. Dwyer, for appellant.

Kennedy, Holland, De Lacy & Svoboda and Edwin Cassem,
contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE,
CARTER and MESSMORE, JJ.

EBERLY, J.

This is a compensation case. Harold Hart, appellant here,
was plaintiff in the Nebraska workmen's compensation court
and the American Community Stores Corporation was
defendant therein. In plaintiff's original petition filed May
25, 1938, in the compensation court, it is alleged that, while
in the employ of the defendant on or about February 4,
1938, as store manager, and while carrying a crate of vege-
tables from the main storeroom of defendant to the base-
ment, he stepped on a lettuce leaf causing his feet to slip
and him to fall on the basement steps; that the crate struck
him in his right groin, bruising the same; that at first the
injured condition was not serious, but a few weeks later it
developed a "gas bacillus infection" and necessitated his
going to the hospital and leaving his employment on March
19, 1938; further, that plaintiff has not recovered and his
injuries are permanent. There was a trial before a single
member of the Nebraska compensation court, and from an
adverse ruling therein, plaintiff waived hearing before the

compensation court (*en banc*), and appealed directly to the district court for Otoe county, filing, in said cause, his amended petition on appeal on January 19, 1939. On August 14, 1939, the cause having theretofore been tried, argued and submitted to the district court, that court adjudged that plaintiff had not sustained the burden of proof required of him, and had failed to show with reasonable certainty that the disability of which he complains arose out of and in the course of his employment, and decreed that plaintiff's petition be dismissed and the judgment of the Nebraska compensation court be affirmed. Plaintiff appeals.

The evidence discloses that plaintiff was employed by the defendant approximately seven years at the time the accident in suit is alleged to have occurred. He acted first as a store-helper, then later as assistant manager at Plattsmouth, until July or August, 1933, when he was transferred to Auburn, Nebraska, where he opened up a store for the defendant. He remained at that place in defendant's employ until February, 1934, at which time he was transferred to Nebraska City and took over the management of defendant's store located then in that city, and continued there until March 19, 1938, when, on account of his then condition, he was compelled to cease the rendition of his services. During all this time, and in fact for a period of thirteen years, he had not lost a day on account of illness or injury. His wages were $37.50 a week at the time he says the injuries in suit were suffered. Plaintiff's testimony is that on or about February 4, 1938, at about 10:30 o'clock in the forenoon of that day, he was carrying a crate of vegetables from the main store-room to the basement where he was employed; at the head of the stairs at that time there were lettuce leaves or trimmings on the floor; plaintiff stepped on these, his feet slipped out from under him, causing him to fall, and he bumped down the steps; he thought there were seven steps; when he fell the crate of vegetables struck him on the right leg in or near the groin, causing a severe bruise and skin abrasion so that the blood oozed out; both hips and his lower back struck on the steps, and were bruised; plain-

tiff experienced "quite a lot of pain" and had difficulty in getting up. His wife testifies that, when plaintiff came home "that day at noon," when he got out of the car he "was sort of humped over with his hands on his hips." An examination by her found "the skin was peeled up on his leg" and "it was red all around there and back here (indicating)," and on three different places on his hip and on his backbone it had started to turn blue. The evidence offered by plaintiff was to the effect that Dr. Westover of Plattsmouth had been plaintiff's family physician for about twelve years, and that on February 9, 1938, plaintiff consulted him about the injuries he suffered. Thereafter this doctor "saw" plaintiff on the following dates: February 13 and 16, office calls made by the patient; and on February 21, February 27, March 3, 6, 11, 13, 16, 21 and 23, house visits were made by Dr. Westover.

Dr. Westover testified that when plaintiff first came to him he was complaining with pain in the lower back, in the sacroiliac region, pain in both hips and considerable pain in the right groin. Plaintiff, in giving the history of his condition, told the doctor of the accident occurring as is hereinbefore set forth. The doctor administered treatments in the form of hot packs, diathermy and some medicine. He continued to see plaintiff off and on for a period of time until when he saw plaintiff in his home where he was bedfast. On March 31, 1938, he was sent to the Clarkson Hospital at Omaha by Dr. Westover.

As to sending plaintiff to this hospital, Dr. Westover testified as follows: "About three or four days previous to my sending him up there, the condition in the groin had progressed to the point where I thought there was a collection of pus there. I might say that that had been gradually developing over quite a long period of time, that is, several weeks; and three or four days before I sent him to the hospital I made a two-inch incision over the inguinal glands there to go in and evacuate this pus. Before going in too deep, I inserted a large needle and was rather surprised to find the syringe fill up with gas so I put a sterile dressing

and made arrangements to send him to the hospital immediately, realizing it was a gas bacillus infection."

On cross-examination the following evidence was elicited from this witness: "I have it written down here the day he came in; bruised left hip, right hip, sacroiliac, lumbar region, right groin bruises, discoloration right thigh and groin." After giving the dates on which witness had seen Hart, the following question was asked and answer given on cross-examination: "Q. What do you contend was wrong with Harold Hart? In other words, what was your diagnosis of Harold Hart's condition? Is it your contention that he had nothing except bruises about the 4th of February, from which, on the 21st of March, he developed a gas bacillus infection? A. My contention is that the corner of the vegetable crate striking him in the right groin caused a traumatic adenitis; that is, a traumatic injury to the inguinal glands in that region with subsequent swelling or suppuration. The gas bacillus infection was a complete surprise to me. It is true that the groin was crushed; the skin not lacerated but scraped, and we had the gas bacillus present. Now, from the time I took charge of Mr. Hart, I do not know that he consulted any other physician nor did he have any other injury that I know of, so I can only assume that this infection was secondary to the bruising and scraping of the skin in that region and the gathering of pus in the groin, the adenitis. Some of the joint trouble could have been secondary to the infection and secondary to the original injury, in view of the knowledge I have of it. I can assume or come to no other conclusion."

The conclusions stated by Dr. Westover are, in a measure, supported by Dr. Eaton who testifies as plaintiff's witness.

The testimony of defendant's witnesses presents a different view of the factual situation, and takes issue with conclusions of plaintiff's witnesses above set forth.

We are inclined to the view that plaintiff met with an accident substantially as alleged in his petition on February 4, 1938, but do not feel that the injuries so received de-

veloped into or caused the "gas bacillus infection" as alleged in his petition.

The two physicians at Clarkson Hospital in Omaha (Drs. Hicken and Kos) to which hospital plaintiff was taken on March 31, 1938, when in an exceedingly serious condition, testify that the following is the substance of the medical history given by plaintiff: (Dr. Hicken) "Here is the history which I obtained from the patient when he came in. He was acutely ill. Here is the history: About four weeks ago the patient had an acute venereal infection, following which he developed a stricture * * * in Nebraska City. They also found he had a positive serology and began to treat him with various arsenical and bismuth preparations. The man did very well for about two weeks, when he began to notice some pain in his right leg, swelling of the inguinal glands; these they hot packed and continued to give him specific treatment for gonorrhea and lues. About a week ago he became dissatisfied with his treatment because he was making no progress and went to Dr. Westover. He found some swollen, enlarged lymph glands in the right inguinal area, some supraclavicular and supratrochlear lymph glands, and in view of the fact that he had this positive serology he thought this lymphadenopathy was on the basis of a luetic infection superimposed or aggravated by a specific bacterial infection of the lower inguinal glands."

Dr. Kos, who was present in the Clarkson Hospital where the history was taken by Dr. Hicken, is corroborative of Dr. Hicken, and testifies that this history so taken disclosed that: "Patient has been under antiluetic treatment for some time. Also receiving treatment for gonorrhea. About two weeks ago sounds were passed transurethrally and four days ago the patient noticed swelling with extreme tenderness in right groin. An incision was made but no discharge of any character exuded. Condition became so unbearable that patient was advised to hospitalization."

It should be said that plaintiff denies he made any of the statements at this time which would justify the foregoing record. But, a Dr. C. Eugene Brown was produced by

defendant, and he testified that in 1938 his first contact with plaintiff Hart was on February 23 at which time Hart gave him the following history: "On 2-23-38. Six weeks ago a small sore came on penis. Went to doctor. The doctor gave him a wash and powder for it. Has been getting worse since. Cannot sleep and is in constant and severe pain." Dr. Brown's records show that he saw Hart on February 23, 24, 25, 26, 27, 28, March 1, 2, and 3, 1938. That a "dorsal incision" which Hart claims was performed by Dr. Brown in January was actually performed on February 27, 1938. It also appears that a "Wassermann" taken March 1, 1938, was submitted to the Nebraska Public Health Laboratory, and reported on March 3, 1938, as "strong positive." Dr. Brown testifies as to plaintiff's then condition, viz.: "Glans penis swollen and hard. Entire distal half red and swollen. Foreskin cannot be retracted." It appears from his testimony that, after the "dorsal slit" made by him, the entire glans was pitted by infectious material and the foreskin near the frenum was all infected, and that a foul, purulent, copious discharge from the penis was noted, and the breaking out of a suspicious rash was noted the day after the "Wassermann" was taken by this doctor. Dr. Brown's testimony is that he did not give him any treatment for dilating the urethra, but there is evidence in the record which tends to establish that Hart was treated by another physician before coming to Dr. Brown, whose evidence is not in the record.

Dr. E. L. MacQuiddy, who is connected with the University of Nebraska, and whose specialty is internal medicine and diagnosis, examined Hart on June 7, 1938, and again on March 29, 1939, preceding the trial. He testifies that "the nature of the infection developing in Mr. Hart's right groin is a very peculiar one following trauma such as he described. A gas bacillus infection usually follows an open wound. According to the man's statement there was no open wound at the time of this injury. It would certainly seem that there was some secondary factor entering this case between the time of the accident and the time Mr. Hart went to the

hospital. * * * I believed that the man was suffering from a neuritis principally affecting the nerves of the left leg. It was my opinion that this neuritis was the result of the inflammation and subsequent scar tissue formation following the gas bacillus infection." With reference to the period of development of the infection after inoculation, Dr. Mac-Quiddy testified: "It would be a period of four to five days before March 31; a period of four to six days when that thing began. I mean before March 31. If it runs true to the form of gas bacillus infection with which I am familiar, it would occur two days, or four days before the origin was found, which in this case, I think, was March 26. * * * Q. Could a swelling of the lymphnode follow it? A. Yes." This witness also testifies that the dilation of the urethra, by the use of a sound, if performed, might furnish an opportunity for a gas bacillus infection if the mucous membrane of the urethra was torn in the operation.

Without setting forth this evidence at length, it is but fair to say that the testimony of defendant's medical witnesses fully sustains the conclusion that, while plaintiff's physical condition is due wholly to the result of "gas bacillus infection," there is no causal connection established between the accident or fall of February 4, 1938, and the gas bacillus infection which caused plaintiff's physical impairment. This, we accept as true, in the light of all the facts and circumstances disclosed by the record before us.

It follows that the finding and judgment of the trial court that plaintiff had failed to show with reasonable certainty that the disability of which he complains arose out of and in the course of his employment are fully supported by the evidence, and, upon trial *de novo,* we agree therewith.

The judgment of the district court is, therefore, correct and is

AFFIRMED.